708 So.2d 447 (1998)
Millicent Clesi Brodtmann, Wife of Edwood S. BRODTMANN, et al.
v.
Claude W. DUKE, and Kremer Marine, Inc.
No. 96-CA-0257.
Court of Appeal of Louisiana, Fourth Circuit.
February 11, 1998.
Rehearing Denied March 16, 1998.
Writs Denied April 24, 1998.
*450 Jerald N. Andry, Gilbert V. Andry, III, Gilbert V. Andry, IV, Andry & Andry, APL, New Orleans, for Plaintiffs/Appellants.
Daniel A. Webb, Charmagne A. Padua, Hoffman Sutterfield, APLC, New Orleans, for Defendant/Appellee.
Eric A. Bopp, Edward S. Bopp, a Law Corporation, Arabi, for Cross-Claimant/Appellant Claude Duke.
Lawrence J. Ernst, C. Edgar Cloutier, III, Patricia B. Judice, Christovich & Kearney, L.L.P., New Orleans, for Defendants/Appellees.
Before PLOTKIN, JONES and CIACCIO, JJ.
CIACCIO, Judge.
Following a lengthy bench trial in this maritime suit for wrongful death, the trial court rendered judgment awarding compensatory damages to plaintiffs, but denied their claim for punitive damages. The trial court also awarded damages on a cross-claim against defendant, but denied the cross-claim for punitive damages. Plaintiffs and cross-claimant have appealed from this judgment, and defendant has answered the appeal, alleging several assignments of error regarding the imposition of liability and the assessment of damages. For the reasons stated more fully herein, we affirm the judgment of the trial court.

FACTS
On October 10 and 11, 1989, Edward Brodtmann, a 64-year old retired salesman, was a passenger aboard the M/V PEGGY D, which was owned and operated by Brodtmann's longtime friend, Claude W. Duke. Duke, Brodtmann and two other friends had planned an overnight fishing trip on Duke's *451 thirty-seven foot cabin cruiser in Louisiana waterways. On October 10, 1989, the men anchored the vessel in the area of Johnson Bay and Picnic Bayou in St. Bernard Parish. They then boarded three smaller fishing boats which were attached to the M/V PEGGY D for the purpose of fishing in the low-lying marshes. They returned to the M/V PEGGY D that evening and began to prepare dinner. During this time, Claude Duke retired to the wheelhouse, and his three companions remained in the cabin. Duke awoke the following morning and found his friends dead. He hailed a passing vessel, the M/V MANIAC, which alerted the U.S. Coast Guard. It was subsequently determined that the three men died of carbon monoxide asphyxiation. Duke was transported to a hospital for medical examination and was released the same day.
Claude Duke purchased the M/V PEGGY D in 1968. At the time of purchase, the vessel was equipped with a marine gasoline generator manufactured by Onan Corporation (Onan) which was in place on the vessel at the time of this incident. Duke retained a mechanic to perform the required maintenance aboard the vessel.
As the incident occurred in the waterways of St. Bernard Parish, the St. Bernard Parish Sheriff's Office began an investigation into the cause of this accident. The Sheriff's Office retained Gene Jackson, a marine surveyor, to determine whether the accident was caused by mechanical deficiencies. Following an inspection of the vessel, Mr. Jackson determined that an exhaust pipe nipple in the generator's exhaust elbow assembly had corroded and broken, thus allowing carbon monoxide gases to escape into the cabin areas of the vessel.
On October 8, 1990, Millicent Clesi Brodtmann, decedent's widow, and decedent's three adult children, Lisa Brodtmann Bruno, Edwood S. Brodtmann, Jr., and Richard H. Brodtmann, (hereinafter "plaintiffs" or "the Brodtmanns"), filed this wrongful death and survival action in the district court in St. Bernard Parish based on negligence principles. Plaintiffs originally named as defendants Claude Duke, the owner of the vessel, and Kremer Marine, Inc., which had performed inspection and mechanical work on Duke's vessel. Kremer subsequently filed a third-party demand against Three B's Pump Company for failing to properly repair the generator and also against Onan Corporation, the manufacturer of the generator located on the M/V PEGGY D. Claude Duke also filed cross-claims against Kremer Marine and Onan Corporation for indemnity for the claims made against him by plaintiffs.
On May 1, 1992, plaintiffs filed an amended petition for damages naming as defendant Onan Corporation and its insurer, Liberty Mutual Insurance Company, alleging negligence and strict liability theories based on Onan's failure to properly design the generator against defects and for failure to warn of said defects. Plaintiffs further alleged that defendants Kremer Marine and Onan were guilty of gross, wanton and willful misconduct sufficient to warrant the imposition of punitive damages.
Claude Duke subsequently amended his cross-claim against Kremer Marine and Onan Corporation to allege a claim for personal injuries he sustained as a result of failure of the generator as well as a claim for punitive damages. Onan filed a reconventional demand against Duke for indemnity, alleging that Duke was liable for plaintiffs' injuries by failing to maintain his vessel. Onan also amended its answer to plaintiffs' petition to include a plea of comparative fault on the part of plaintiffs' decedent, Edwood Brodtmann.
This matter was tried in a bench trial over a ten-week period. On May 2, 1995, the trial court rendered judgment awarding compensatory damages in favor of plaintiffs and against defendant, Onan. The trial court also rendered judgment in favor of Kremer Marine, dismissing plaintiffs' claims and the cross-claims of Duke and Onan brought against Kremer. The trial court further rendered judgment awarding compensatory damages in favor of Claude Duke on the basis of his cross-claim against Onan. The trial court dismissed plaintiffs' and Duke's claim for punitive damages.

*452 PLAINTIFFS' AND DUKE'S APPEAL

Mrs. Brodtmann and the three Brodtmann children argue two assignments of error by their appeal: (1) that the trial court erred in failing to award punitive damages, and (2) that they are entitled to an award of pre-judgment interest in accordance with general maritime law. Claude Duke also appealed from the judgment of the trial court, asserting identical assignments of error as those urged by the Brodtmanns. Both the Brodtmanns and Duke will be referred to as plaintiffs in this section.

Applicable Law
Determination of the question of whether a tort is "maritime" and thus within the admiralty jurisdiction of the federal courts has traditionally depended upon the locality of the wrong. Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 252-53, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972). Generally, federal maritime jurisdiction is invoked whenever an accident occurs on navigable waters and in furtherance of an activity bearing a significant relationship to a traditional maritime activity. Offshore Logistics v. Tallentire, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986).
Although the United States Constitution grants to federal district courts jurisdiction in all "cases of admiralty and maritime jurisdiction," state courts have concurrent jurisdiction by virtue of the "savings to suitors" clause of the Judiciary Act of 1789. U.S. Const. art. III, section 2; 28 U.S.C.A. section 1333. This case arose out of an incident on a vessel in navigable waterways and in furtherance of an activity bearing a significant relationship to traditional maritime activity, and although it falls within the federal admiralty jurisdiction, the Louisiana state court has concurrent jurisdiction over plaintiffs' claim.
Even though this maritime tort case was brought in state court, reference to admiralty law is necessary to determine the rights and liabilities of the parties. Mayo v. Nissan Motor Corp. in U.S.A., 93-852, (La. App. 3rd Cir. 6/22/94), 639 So.2d 773, writs denied, 95-0147, 95-0148, 95-1060 (La.3/17/95), 651 So.2d 280, 281. In Green v. Industrial Helicopters, Inc., 593 So.2d 634, 637 (La.1992), cert. denied, sub nom, Industrial Helicopters, Inc. v. Green, 506 U.S. 819, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992), the Louisiana Supreme Court stated:
As a general proposition, `[a] maritime claim' brought in the common law state courts ... is governed by the same principles as govern actions brought in admiralty, i.e., by federal maritime law ... Since the general maritime law is not a `complete or all inclusive system,' a federal court may adopt state statutory law and common law principles as the federal admiralty rule. State law and regulations may also supplement federal maritime law when "there is no conflict between the two systems of law, and the need for uniformity of decision does not bar state action." (citations omitted.)
The court further explained that "a Louisiana state court should respect Louisiana law unless there is some federal impediment to application of that law contained in federal legislation or a clearly applicable rule in the general maritime law." Id., 593 So.2d at 638; Mayo v. Nissan Motor Corp., 639 So.2d at 784.

Punitive Damages
There is no dispute in the present case that punitive damages are not available under Louisiana substantive law based on the facts herein. Plaintiffs argue however that punitive damages are recoverable under general maritime law.
In the present case, the trial court denied plaintiffs' claim for punitive damages based on this Court's previous decision in Bridgett v. Odeco, 93-1536 (La.App. 4 Cir. 12/15/94), 646 So.2d 1249, 1254, writs denied 95-0381, 95-0398, (La.3/30/95), 651 So.2d 840, in which a seaman filed suit for damages in state court under general maritime law against his Jones Act employer and against Odeco, the owner of the vessel on which he was injured. In his petition, plaintiff sought punitive damages against Odeco. Odeco responded with an exception of no cause of action, arguing that the general maritime law does not provide for awards of punitive damages. The trial court granted Odeco's exception and this Court affirmed, holding that punitive damages *453 are no longer recoverable in this jurisdiction under the general maritime law.
In reaching this conclusion, the panel of this court relied on the benchmark decision of the United States Supreme Court in Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). The specific issue in Miles was whether the unavailability under the Jones Act of damages for loss of society and lost future income precludes recovery of these damages under a general maritime law unseaworthiness claim. The court held that it does. In Miles, the high court held that based on uniformity principles, there is no right to a claim for loss of society under the general maritime law because there is no right to such under the Jones Act. As stated by this Court in Bridgett, the apparent intent of the Court in Miles was to impose a uniform rule on all actions for the wrongful death of a seaman, whether brought pursuant to federal legislation or under the general maritime law. Bridgett, supra, 646 So.2d at 1252. As non-pecuniary damages (including a claim for loss of society) are not recoverable under the Jones Act, they cannot be recovered under the general maritime law.
For many years prior to Miles, punitive damages had been recoverable as an appropriate remedy under general maritime law. In the wake of Miles, however, courts have been increasingly hesitant to allow punitive damages in certain general maritime actions involving personal injury or death. This court noted this fact in Bridgett, citing to several federal court cases which have applied the principles set forth in Miles and have held that punitive damages are not available under the general maritime law. See, Miller v. American President Lines, Ltd., 989 F.2d 1450, 1459 (6th Cir.), cert. denied, 510 U.S. 915, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993); Anderson v. Texaco, 797 F.Supp. 531, 536 (E.D.La.1992); Rollins v. Peterson Builders, Inc., 761 F.Supp. 943, 949-950 (D.R.I.1991). The Bridgett opinion also cited to the Fifth Circuit decision in Guevara v. Maritime Overseas Corp., 59 F.3d 1496, 1512 (5th Cir.1995) cert. denied, 516 U.S. 1046, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996) (en banc) and to the cases cited therein which held that punitive damages are now unavailable under the general maritime law.
Further, the court in Bridgett noted that only two Louisiana courts have concluded that punitive damages remain recoverable under general maritime law: this circuit in Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4th Cir.), writ denied, 613 So.2d 996 (La.1993), cert. denied, sub nom, Brown & Root, Inc. v. Mistich, 509 U.S. 913, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993), and the Louisiana Third Circuit Court of Appeal in Ellender v. Texaco, Inc., 93-1803 (La.App. 1 Cir. 6/24/94); 640 So.2d 845, writ denied, 94-2339 (La.9/30/94), 642 So.2d 883. The court in Bridgett found that these decisions represent anomalous interpretations of Miles, and a majority of the court en banc overruled the prior decision regarding the awarding of punitive damages in Mistich. This Court specifically held:

Miles' wake is now clear: the great weight of law demonstrates that punitive damages are not [sic] longer recoverable under the general maritime law. Accordingly, we overrule the holding in Mistich. Punitive damages shall no longer be available to a plaintiff who brings an action under the general maritime law in a court subject to this court's jurisdiction.
On appeal of the decision of the trial court in this case, plaintiffs contend that this Court's previous holding in Bridgett is distinguishable from the instant case because the decedent here was not a seaman as was the plaintiff in Bridgett. Plaintiffs further argue that the basis for the holding in Miles and its progeny, including Bridgett, was to support the objective of uniformity between suits brought under the Jones Act and those brought under the general maritime law. As Mr. Brodtmann was not a seaman, plaintiffs contend that their claim is not affected by the provisions of the Jones Act and therefore the objective of uniformity is not meaningful. In other words, plaintiffs contend that the limitations of the federal statute do not affect their claim brought solely under the general maritime law, and as there is no federal legislation precluding punitive damages, the longstanding provisions of the general maritime law apply.
*454 In support of their position that punitive damages are recoverable under general maritime law, plaintiffs cite CEH, Inc. v. F/V SEAFARER, 70 F.3d 694 (1st Cir.1995), wherein the federal appellate court affirmed the district court's granting of punitive damages, citing a long line of federal cases in which punitive damages have been awarded in general maritime actions where defendant's intentional or wanton and reckless conduct amounted to a conscious disregard of the rights of others. Although these cited decisions pre-dated Miles, the First Circuit in CEH, Inc. v. F/V SEAFARER found that the decision in Miles was inapplicable to a resolution of whether punitive damages are available under general maritime law because there is no federal legislation which precludes the recovery of such damages and there is therefore no overriding uniformity interest which was relied on in Miles.
We find the decision in CEH, Inc. v. F/V SEAFARER is not controlling here. Further, we find this Court's holding in Bridgett is not distinguishable from the present situation. Although the plaintiff in Bridgett was a seaman vis-a-vis his employer and the Jones Act legislation clearly applied, his claim for punitive damages was brought against Odeco as owner of the vessel solely under the general maritime law. The plaintiff in Bridgett was not a seaman in his relationship with Odeco, and this Court in Bridgett specifically held plaintiff had no claim for punitive damages in his general maritime claim against Odeco. Under these circumstances, we conclude that the holding in Bridgett is directly applicable to the case before us, where plaintiffs brought a claim for punitive damages under the general maritime law for the death of a non-seaman.
While we recognize that punitive damages have long been available under the general maritime law, we are also cognizant of the changes in this area of the law over the last several years. Although plaintiffs rely on a decision from the First Circuit which refused to apply Miles to a claim for punitive damages brought under the general maritime law, we find the overwhelming weight of the jurisprudence in this jurisdiction to support this Court's decision in Bridgett.
In sum, we are bound by the specific holding of this Court in Bridgett v. Odeco which stated that punitive damages are not recoverable under the general maritime law to claims brought within our jurisdiction. We therefore find no error in the trial court's denial of plaintiffs' claim for punitive damages in this case.

Pre-Judgment Interest
By their second assignment of error, plaintiffs contend that the trial court erred in awarding legal interest from the date of judicial demand rather than from the date of the accident. Plaintiffs are correct that the awarding of pre-judgment interest from the date of loss is the rule under general maritime law. Mayo v. Nissan, supra, 639 So.2d 773, 789. Under the federal law, the trial court has the discretion to deny pre-judgment interest from the date of loss only when there are "peculiar circumstances" that would make it inequitable for the losing party to be forced to pay pre-judgment interest. Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir.1980).
However, the determination of whether the plaintiff is entitled to pre-judgment interest initially depends on whether he recovers under federal or state law. Corliss v. Elevating Boats, Inc., 599 So.2d 434 (La. App. 4th Cir.1992). Under federal law, pre-judgment interest is awarded from date of injury; under state law, pre-judgment interest is awarded from the date of judicial demand. LSA-R.S. 13:4203; Schackai v. Tenneco Oil Co., 436 So.2d 729, 735 (La.App. 4th Cir.), writ denied, 440 So.2d 759 (La.1983).
In the present case, the trial court awarded interest from the date of judicial demand as is appropriate under state law, LSA-R.S. 13:4203. Onan, the manufacturer of the gasoline generator, was held liable to the Brodtmanns under theories of state law, specifically, the Louisiana Products Liability Act. There is no indication from the trial court's reasons for judgment that Onan was held liable under general maritime law. Further, Onan was held liable to Claude Duke on theories of state tort law. Under the circumstances presented here, we find *455 that as the trial court based its award of damages on state law, the award of pre-judgment interest must also be based on state law. The general maritime law is not controlling here, and plaintiffs are not entitled to federal pre-judgment interest. We find no error of the trial court in its award of judicial interest from the date of judicial demand.

DEFENDANT'S APPEAL
By their appeal, Onan raises several assignments of error which can be divided into four arguments:
1. The trial court erred in finding Onan liable based on the Louisiana Products Liability Act.
2. The trial court erred in failing to apportion fault to Claude Duke.
3. The trial court erred in awarding damages to Duke for emotional injuries and in the alternative, the damages awarded were excessive.
4. The damages awarded to Mrs. Brodtmann and the decedent's three adult children were excessive.

Evidentiary Errors
With regard to the trial court's finding of liability, Onan's first contention on appeal is that the trial court's judgment was a result of erroneously admitted evidence which clouded the record and prejudiced their case. Onan argues that the trial court erred in denying their motion to exclude evidence of other accidents which plaintiff sought to introduce. At trial, plaintiff introduced evidence in the form of pleadings, depositions, and testimony of witnesses relating to six previous incidents which occurred between 1973 and 1988 in which various plaintiffs made claims against Onan for a defect in a marine generator. The trial court heard arguments as to the relevance and admissibility of this evidence, and the court admitted into the record a portion of the evidence plaintiff sought to introduce. The remaining evidence was profferred by plaintiffs for purposes of this appeal.
Onan now argues that the trial court erred in allowing this evidence, which Onan contends is irrelevant and highly prejudicial, into the record. Thus, Onan argues, the judgment of the trial court is tainted and no weight should be accorded to it. Onan contends that on the basis of this evidentiary error, this Court must conduct an independent review of the record without deference to the trial court's findings and without reliance on the manifest error standard, citing McLean v. Hunter, 495 So.2d 1298 (La.1986).
The trial court's decision to admit or exclude evidence is governed by the Louisiana Code of Evidence, specifically the following articles:
La. C.E. art. 401
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
La. C.E. art. 402
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible.
La. C.E. art. 403.
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
Generally, a trial judge is accorded discretion under the above articles concerning the admission of evidence on the grounds of relevance, and the trial court's decision will not be reversed absent a finding of abuse of discretion. Dixon v. Winn-Dixie Louisiana, Inc., 93-1627 (La.App. 4 Cir. 5/17/94), 638 So.2d 306, 312. Louisiana courts have found that evidence of prior accidents is admissible for the limited purpose of showing that a thing or place was dangerous and the defendant knew of the dangerous condition. However, the prior accidents must be closely related in circumstance to the injury or hazard at issue. Davis v. Louisiana Power & Light Co., 612 So.2d 235, 239 *456 (La.App. 4 Cir.1992), writ denied, 615 So.2d 336 (La.1993), and citations therein. To be relevant, the other accident should occur at substantially the same place, and under substantially the same conditions and must be caused by the same or similar defect, danger, act or omission. Lee v. K-Mart Corp., 483 So.2d 609, 613 (La.App. 1st Cir.1985), writ denied, 484 So.2d 661 (La.1986).
In the present case, the trial court conducted a detailed and thorough examination of the evidence plaintiffs sought to introduce concerning these previous accidents. The trial judge stated on the record that he was only interested in evidence from the other accidents insofar as they related to the condition of the exhaust nipple and whether the injuries were sustained as a result of carbon monoxide inhalation. The trial court excluded from admission into the record any extraneous evidence which the trial court did not believe specifically related to the facts of the Brodtmann case.
We have carefully reviewed the record in this case, including the numerous offers of evidence and the trial court's rulings thereon, and find that the trial court limited the admitted evidence to facts specifically relating to the present accident, and specifically the condition of the nipple in the previous incidents and whether the injuries were caused by carbon monoxide inhalation. Based on our review of the record in this case, we are unable to find an abuse of the trial court's discretion in the admission of evidence. Although we find that the proffered evidence is not relevant to the facts of the case before us, we find the trial court's admission of limited evidence and testimony regarding the previous accidents involving Onan generators to be relevant and admissible.

Standard of Review
As we have found no abuse of the trial court's discretion in the admission of evidence, the standard of review is the well-established manifest-error rule set forth in Stobart v. State through Dept. of Transp. & Development, 617 So.2d 880, 882 (La.1993):
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record established that the finding is clearly wrong (manifestly erroneous).

See. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review whether conflict exists in the testimony.
We turn next to an examination of the record before us based on this well-settled principle of review.

Louisiana Products Liability Act
Although plaintiffs' state court claim falls within the federal admiralty law which recognizes general theories of negligence, strict liability and products liability, Louisiana courts have applied the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq., as a supplement to the general maritime law. See, Mayo v. Nissan, 639 So.2d at 784. The trial court evidently found Onan liable based on LSA-R.S. 9:2800.57 which provides:
A. A product is unreasonably dangerous because an adequate warning about the *457 product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:
(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonable prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
In its reasons for judgment, the trial court made the following factual findings: 1) that the exhaust nipple manufactured by Onan in this case was a critical component of the exhaust system of the gasoline generator; 2) that the nipple had a limited useful life; 3) that it failed as part of its normal use by corroding from the inside out making inspection difficult; 4) that it constituted a danger inherent in its normal use; and 5) that the warnings provided by Onan regarding this danger were inadequate.
The trial court further stated as follows:
As indicated hereinafter, Onan failed in its duty to warn. The nipple in the exhaust elbow assembly was not a "maintenance" item (the inspection [that] was called for was inadequate where failure occurred from the inside out) ... The evidence further supports a finding that an exhaust system is basically an expendable system. They corrode and eventually require replacement. The nipple used in the exhaust elbow assembly was apparently expected to last from one major overhaul to another and should have been designed to last at least as long as the other components of the exhaust elbow assembly. Failing to achieve such objective, Onan then had a duty to warn.
Even if one does not accept that exhaust systems are expected to eventually require replacement, the material selected and used in [the] pipe nipple which failed had a limited useful life. The standards considered and used by Onan in their material selection for the assembly provides that the material has a limited life. This nipple was a critical component of the exhaust system. A failure of this part would allow the escape of poisonous gas into a confined area where human presence was foreseeable. Based on information available, including material standards, Onan knew or should have known the nipple had a limited life. As indicated and supported by evidence, the issue was not whether it would "rust" away, but rather how long it would take. Despite this, no warnings of this fact and the dangerous risks posed by a failure were given.
The trial court thus made a factual finding that the exhaust nipple of Onan's generator presented a danger inherent in its normal use. The trial court further found that the danger was not readily discernible to the user because the nipple corroded from the inside out making inspection difficult.
Onan contends in brief that at the time of its design, the materials used in the exhaust nipple were state of the art and conformed to industry standards, and that plaintiffs failed to prove that there was an alternative design which would have prevented the harm here. However, the record contains conflicting expert testimony regarding the performance of the galvanized steel which was used as the material in the design of the nipple. Plaintiffs' materials expert, Dr. Robert Rose, *458 testified that galvanized steel was an inappropriate metal due to the high temperatures in the operation of the generator. Plaintiffs' metallurgist concurred in this opinion. Defendant's experts testified that galvanized steel was an appropriate material because the temperature of the generator never reached the high temperature relied on by plaintiffs' experts and that galvanized steel conformed to all industry standards. Further, the record contains the testimony of several of Onan's employees who gave conflicting and varying statements as to the exhaust gas temperatures and the effects on the galvanized steel exhaust nipple.
The trial court apparently believed the opinions of plaintiffs' experts regarding the suitability of the material chosen by Onan and chose not to credit the testimony of Onan employees. We find the evidence in the record provides a reasonable factual basis for this determination. Although the record fails to conclusively prove that another material, namely stainless steel, would have prevented the corrosion of the nipple, the evidence certainly supports a finding that the galvanized steel nipple was capable of corroding at the temperature required to operate the generator. This finding is also supported by the evidence in the record that the nipple corroded in the same manner on previous occasions, presenting a hidden danger.
Onan argues that a manufacturer is not required to design a product with components that never fail or that will withstand abuse or lack of maintenance. Onan further argues that it should not be required to warn the user of dangers which are obvious to the end user. Although we do not dispute these statements, we fail to find these rules applicable in the present situation. The trial court found that the nipple in Onan's generator had a limited useful life and that it required replacement more frequently than other major components of the system. Further, the trial court made a factual determination that the nipple corroded from the inside out and made inspection for replacement purposes difficult. The danger to the user was therefore not an obvious one. Plaintiffs' expert, Dr. Rose, testified that in order to inspect the condition of the nipple, the component would have to be removed from the exhaust system so that the interior of the nipple could be examined. Although Onan was not required to design a component which never failed, if the component which is provided has a limited useful life and inspection is rendered difficult under normal use, Onan has a duty to warn the user of the foreseeable harm. Onan failed to do so, and the record reasonably supports the trial court's factual determination.
The trial court made a factual determination that the warnings provided by Onan were inadequate to warn of the danger inherent in the use of this generator. Although Onan warned that failure to provide necessary maintenance would cause damage to the plant, Onan failed to warn specifically that the exhaust nipple begins to corrode from the inside and failure to replace this component would result in emission of deadly carbon monoxide gases. In fact, the owner's manual did not contain reference to the exhaust nipple and the necessity to replace it before it fails. Our review of the record reveals a reasonable basis for the trial court's determination that Onan's warnings regarding this danger were inadequate.
Likewise, we find no merit in Onan's argument that it should be relieved of liability here because Duke admitted he did not read the owner's manual, and that therefore any enhanced warnings would have been futile. We find that the record in this case indicates that Onan was aware from previous accidents that the exhaust nipple on this generator corroded from the inside out and allowed the emission of carbon monoxide gases. Based on this knowledge, Onan had a further duty to inform end users of the danger inherent in the use of its generator, either by a recall or a letter to end users. Although Onan possessed or should have possessed the knowledge that the nipple when left unchecked presented a danger which could cause loss of human life, Onan failed to take steps to warn the end user of this danger. The trial court found Onan liable for this failure, and we find no manifest error in this determination.
Accordingly, we find a reasonable factual basis for the trial court's determination that *459 Onan is liable for plaintiffs' damages based on the provisions of the Louisiana Products Liability Act. We find no manifest error in the trial court's determination, and we affirm the trial court's finding of liability on the part of the manufacturer.

Duke's Negligence
Defendant next contends that the trial court erred in failing to apportion any fault to Claude Duke. Defendant contends that Duke was negligent in failing to adequately maintain the generator and in failing to inspect and replace the exhaust nipple as needed. Defendant argues that the condition of the generator on Duke's vessel was in violation of marine standards as well as Onan's instructions and warnings. Further, defendant contends that Duke was negligent in failing to read the Onan manual which was provided to him at the time he purchased the vessel.
As Duke was the owner of the vessel on which this accident occurred, the trial court found Duke liable for plaintiffs' damages under the strict liability provisions of La. C.C. art. 2317. However, the court found that Duke was not negligent in the cause of this accident. In his reasons for judgment, the trial court relied on the finding made by Gene Jackson of the St. Bernard Parish Sheriff's Office that the vessel was well-maintained, "clean and tight." The court further noted that shortly after the incident the generator was seen as clean and serviced properly. Further, the court found that the minor deficiencies found by Gene Jackson (a lack of a double hose clamp and a missing brace) were not proximate causes of the accident. Gene Jackson testified at trial that Duke's vessel was in excellent condition and it appeared to be serviced on a regular basis.
We find the trial court's determination to be supported by the record. Although Claude Duke had over forty years worth of boating experience, the record supports the trial court's finding that the exhaust nipple on the Onan generator corroded from the inside out, and that visual inspection would not necessarily indicate that the part needed to be replaced. Even assuming that Duke was negligent in failing to read the generator manual, such failure was not a cause of the accident here. There was nothing in the manual to indicate that this part had a limited useful life or that it would corrode from the inside out making inspection difficult. Further, there was nothing in the manual to indicate that upon failure, the nipple would allow deadly carbon monoxide gases to escape from the generator.
The record shows that Claude Duke, with the assistance of a certified mechanic, adequately inspected and maintained his vessel. Shortly after the incident, the vessel was found to be in good condition. We find no manifest error in the trial court's determination that Claude Duke was not negligent in causing the accident on his vessel.

General Damages
The trial court awarded decedent's widow, Millicent Brodtmann, $500,000.00 in general damages. Mrs. Brodtmann was also awarded $100,000.00 for lost economic benefits as a result of her husband's death. Further, the trial court awarded $150,000.00 in general damages to each of Mr. Brodtmann's three adult children. Defendant contends that these awards are excessive and must be reduced.
"[T]he discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages ... It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
In deciding whether a trial court award was excessive, reviewing courts must first consider the individual circumstances of the subject case to determine whether the trial court abused its much discretion in setting the award. Bernard v. Royal Ins. Co., 586 So.2d 607, 612-613 (La.App. 4th Cir.), writ denied, 589 So.2d 1058 (La.1991). Only after determining that the award in the subject *460 case was improper may the reviewing court consider awards in similar cases. Amedee v. Cruse, 526 So.2d 433 (La.App. 4th Cir.1988). The reviewing court may then increase or reduce the award only to the lowest or highest award which would have been within the trial court's discretion. Id.
The trial court found that the Brodtmanns were a very close family. The court noted that Mr. and Mrs. Brodtmann were together for forty-one years. The court determined that Mr. Brodtmann had been a loving husband and father and that he was the center and literal head of the family. Mr. Brodtmann played an active role in the lives of his wife and three children.
Obviously, the trial court was very impressed by the testimony of Mrs. Brodtmann and the Brodtmann siblings regarding the effect of Mr. Brodtmann's death on the quality of their lives. The death of their husband and father in such a tragic and untimely fashion caused great despair in each of the plaintiffs. Mrs. Brodtmann testified that after her husband retired, he assisted her in the care of her elderly family members and was a good companion to her. Although the Brodtmann children are adults and were not dependent upon their father for financial support, they each testified that he was a great source of emotional support to them. We believe that under these circumstances, the awards made by the trial court are within the sound discretion of the trial court. Although some may find the awards to be on the high end of the scale, we cannot say that the awards are out of proportion or constitute an abuse of the trial court's discretion. We must therefore affirm the awards of general damages made to the plaintiffs in this case.
With regard to the court's award of loss in economic benefits to Mrs. Brodtmann, defendant argues that the testimony of plaintiffs' economic expert, Dr. Melville Wolfson, was erroneous and economically unreliable. Dr. Wolfson opined that Mrs. Brodtmann's loss in economic benefits as a result of her husband's death was approximately $205,000.00. Defendant relies on the testimony of its own expert, Dr. Kenneth Boudreaux, who testified that the highest loss of economic benefit which Mrs. Brodtmann could have sustained based on her husband's age and other factors was approximately $48,000.00. When expert witnesses present conflicting testimony, the trial court's determination of which expert is more credible should not be reversed absent a showing of manifest error. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). We have thoroughly reviewed the testimony of both witnesses and their supporting evidence, and we find no manifest error in the trial court's award of $100,000.00 to Mrs. Brodtmann for economic loss.

Damages awarded to Claude Duke
Defendant argues that there is no legal basis for the award of damages to Claude Duke, and in the alternative, that the trial court's award of $200,000.00 is excessive. In his reasons for judgment, the trial court stated:
Damages awarded to Claude Duke are based on the physical effects of the October 11, 1989, incident and the perhaps more devastating emotional effects and resulting mental suffering. Mr. Duke awoke or possibly regained consciousness on that day to find himself alone on his boat. His three companions all dead. After his rescue he was taken to the hospital. The changes to this once active man were dramatic and apparent. He lost his desire to do anything. His lifestyle changed drastically and his memory failed. He also experienced Post Traumatic Stress Disorder.
Defendant argues that there is no legal basis for Duke's recovery under the facts presented in this case. Defendant contends that although Louisiana law recognizes bystander recovery pursuant to La. C.C. art. 2315.6, the federal law has refused to grant recovery to a bystander for purely emotional injuries. See, Gaston v. Flowers Transportation, 866 F.2d 816 (5th Cir.1989). As Louisiana law conflicts with federal law, defendant argues that state law cannot supplement the general maritime law to provide Duke with a remedy. See, Green v. Industrial Helicopters, Inc., 593 So.2d at 637.
We find no merit in this argument, however. Duke's claim for damages is *461 not a bystander case, where the plaintiff only viewed the accident or came on the scene shortly thereafter, but rather one in which Duke was a victim in the accident and allegedly suffered both physical and mental injuries as a result. Under the general maritime law, recovery has been allowed for emotional injuries where the plaintiff suffered physical impact and tangible physical injuries. Gough v. Nat. Gas Pipeline Co. of America, 996 F.2d 763 (5th Cir.1993). Further, under state law, a participant in an accident is entitled to recover any damages sustained as a result of an injury, whether physical or mental or both. Morris v. Maryland Cas. Co., 94-1556 (La.App. 3 Cir. 5/3/95), 657 So.2d 198. Under the circumstances of this case, the recovery under state law therefore does not conflict with the general maritime law, and the state court may therefore supplement the general maritime law with the state law. The basis of Duke's recovery therefore was general Louisiana tort law.
We turn next to the extent of damages suffered by Duke, who at the time of the accident was 84 years of age. Mrs. Duke testified that prior to this incident her husband was a very social, outgoing person who enjoyed boating and sporting activities. She stated that although he was semi-retired, he continued to practice law and to be very active on a daily basis. After this incident, Mrs. Duke testified that her husband became very depressed and sedentary and refused to see friends or go out. She stated he stopped going to his office and no longer went out on his boat.
Dr. Frank Lansden, a close personal friend and neighbor of Duke's who saw him almost every day, testified that prior to this incident Duke was very active and outgoing. After the accident Duke was very depressed and shaken.
Dr. George Murphy, an internist who examined Duke in the hospital on the date of the accident, testified that Duke appeared to be dazed and confused and that his blood gases indicated a significant exposure to carbon monoxide. Dr. Murphy indicated that the blood gas result had been apparently lost by the hospital, which is why the hospital did not have a record of Duke's carbon monoxide levels.
Dr. William Gassparini, a clinical psychologist who examined Duke in December of 1992 and again in October of 1994, testified that he obtained a history from Duke and performed a psychological test on him in 1992. Dr. Gassparini testified that Duke was suffering from organic brain syndrome and post traumatic stress disorder which he attributed to the inhalation of carbon monoxide and the death of his three friends on his vessel in 1989. Dr. Gassparini stated he found Duke to be depressed and to have had a decline in his cognitive abilities and his perceptual-motor abilities. Dr. Gassparini testified that he believed that Duke's condition was a result of the accident on his vessel, including the physical injury of the inhalation of carbon monoxide and the emotional injury of finding his three companions dead on his vessel.
The assessment of damages is within the sound discretion of the trial court. Youn, supra, 623 So.2d 1257. The evidence in the record is sufficient to support a finding that Duke suffered some degree of carbon monoxide poisoning at the time of the incident. Further, the record supports the trial court's determination that the accident on his boat severely effected Duke's personality. The trial court found that Duke suffered from post traumatic stress disorder, and we find that the record supports this finding. Although the award of $200,000.00 for this type of injury to this plaintiff may be considered by some to be high, we are unable to find that the award is an abuse of the trial court's discretion. Accordingly, we will not disturb the damage award rendered in favor of Claude Duke.

CONCLUSION
Accordingly, for the reasons assigned herein, the judgment of the trial court is affirmed. Each party is to bear its own costs of this appeal.
AFFIRMED.