k KIRBY, Judge.
This is a maritime case brought in state court pursuant to the “Savings to Suitors” clause. Plaintiff, William Wright, and defendant, 2-W Towing, Inc., both appeal the trial court’s judgment, which found each fifty percent (50%) at fault in the accident that forms the basis of this lawsuit.
The accident occurred on June 2, 1995 while plaintiff was performing his duties as a deckhand aboard the M/V REBEL, a vessel owned and operated by plaintiffs employer, 5-J’s Towing, Inc. and National Marine, Inc. On that evening, plaintiff was attempting to replace a broken starboard face wire that was used to secure a barge to the M/V REBEL. The M/V REBEL was not underway at the time, but was tied off to the dock at the National Marine fleet in Carpenter’s Bayou, Texas. Plaintiff testified that he was sitting on the top of the starboard push knee, with his right foot on the steps of the push knee and his left foot on the barge, when he bent down to pick up a piece of cable that he intended to drag onto the barge. As he bent down, the barge and the M/V REBEL slowly separated at which time his left foot came off of the barge and was momentarily between the barge Land the M/V REBEL. When the barge and the M/V REBEL drifted back together, plaintiffs left foot was caught between the barge and the M/V REBEL, causing plaintiff injuries.
Plaintiff filed suit in state court seeking recovery under the Jones Act and general maritime law. He named as defendants his employer 5-J’s Towing, Inc. and National Marine Inc., 2-W Towing, Inc., and Hollywood Marine, Inc. All defendants were alleged by plaintiff to be authorized to do and doing business within the jurisdiction of Orleans Parish Civil District Court. Plaintiff alleges that a passing vessel caused the M/V REBEL and its barge to separate and then drift back together, resulting in the plaintiffs foot being crushed between the M/V REBEL and the barge. In plaintiffs suit, he alleges that the passing vessel was the M/V STORMY V, which was owned and operated by 2-W Towing, Inc. and contracted to Hollywood Marine, Inc. According to plaintiffs allegations, the M/V STORMY V was operating at a excessive rate of speed when it passed the M/V REBEL, creating a significant wake that resulted in the barge and the M/V REBEL separating and then drifting back together and crushing plaintiffs foot.
Following trial, the trial judge granted defendant Hollywood Marine’s motion for involuntary dismissal, thereby dismissing that party from plaintiffs suit. The trial judge found defendant 2-W Towing, Inc. fifty percent (50%) at fault and plaintiff fifty percent (50%) at fault in the accident.[1] The trial judge awarded damages to plaintiff in the amount of $338,485.10 together with judicial interest |sfrom date of demand until paid and all costs of the proceedings and subject to a reduction for the fault attributable to plaintiff. Damages were awarded for pain and suffering, past lost wages, future lost wages, unpaid maintenance and medical expenses. The trial court did not issue written reasons for judgment.
*53 Defendant 2-W Towing Inc. appealed the trial court judgment, and plaintiff has answered the appeal.
Before addressing the other assignments of error assigned by 2-W Towing, Inc. and plaintiff, we find that the award of unpaid maintenance to plaintiff was incorrectly assessed to 2-W Towing, Inc. Plaintiffs Jones Act employer, 5-J’s Towing, Inc. and National Marine Inc., is the party responsible for the unpaid maintenance award in favor of plaintiff.[2] Maintenance benefits are predicated on a seaman’s maritime employment contract, being consistently recognized as an implied provision in contracts with marine employment. Hebert v. Aetna Casualty and Surety Co., 400 So.2d 695, 699 (La.App. 1 Cir.1981), citing Aguilar v. Standard Oil Co. of New Jersey, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). Thus, the payment of maintenance is a contractual obligation that the employer must perform, even though it is a special damage the seaman suffered from a tortious act. Id. at 699.
Accordingly, the judgment in this matter will be reformed to cast 5-J’s Towing, Inc. and National Marine, Inc. in judgment for plaintiffs unpaid maintenance award.
|4Several of the assignments of error argued by both 2-W Towing, Inc. and plaintiff deal with the trial court’s finding that each of those parties was 50% liable for plaintiffs accident. Each argues that the other was 100% responsible. 2-W Towing argues, alternatively, that any negligence not attributable to plaintiff should have been attributed to plaintiffs Jones Act employer, 5-J’s Towing and National Marine, Inc.
2-W Towing also argues that the trial court erred in applying an incorrect legal standard of care in arriving at its judgment. 2-W Towing states that the standard of care owed by a vessel passing a fleeting facility is one of reasonableness, and that a vessel transiting a waterway past a fleeting area cannot be held strictly liable for injuries that occur aboard vessels working in the fleet. According to 2-W Towing, because there was no evidence that the MTV STORMY V caused anything more than a very subtle and expected movement of the MTV REBEL, the trial court effectively held 2-W Towing strictly liable for plaintiffs injuries.
In addressing this argument, we note initially that the trial court did not issue written reasons for judgment. Nothing in the judgment itself supports 2-W Towing’s claim that the trial court found it strictly liable for plaintiffs accident. 2-W Towing suggests that the actions of the MTV STORMY V could not have been found to be unreasonable under the evidence presented. That assertion by 2-W Towing accepts as true its interpretation of the evidence. Assessing the evidence and the credibility of the witnesses is a function of the factfinder. As we will | Bdiscuss below, the judgment casting 2-W Towing 50% at fault in this accident shows that the judge found that evidence showing that the MW STORMY V was being operated in a negligent manner when it passed the fleeting facility was credible. 2-W Towing’s claim that the trial court applied an incorrect legal standard of care is mere speculation on its part that is not supported by the record. This argument has no merit.
In Wood v. SubSea International, Inc., 99-1320 pp. 7-8 (La.App. 4 Cir. 3/29/00), 766 So.2d 563, 568, writ denied, 2000-1237 *54 (La.6/16/00), 765 So.2d 336, this Court summarized the applicable law regarding cases brought under the Jones Act and general maritime law as follows:
Admiralty claims may be brought in federal court pursuant to its admiralty jurisdiction or in state court under the savings to suitors clause; in either case, federal substantive maritime law applies. Antill v. Public Grain Elevator of New Orleans, Inc. 577 So.2d 1039 (La.App. 4 Cir.1991), writ denied 581 So.2d 684 (La.1991). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. Foster v. Destin Trading Corp., 96-0803 (La.5/30/97), 700 So.2d 199, 208.
Factual findings made by the trial court in a claim under general maritime law are reviewed under a clearly erroneous standard, which is the same manifestly wrong or clearly wrong standard of review used by the Louisiana appellate courts in reviewing factual findings of lower courts. Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4 Cir.1992), writ denied 613 So.2d 996 (La.1993), certiorari denied sub nom. Brown & Root, Inc. v. Mistich, 509 U.S. 913, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993). If the district court’s account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it even though it is convinced that if it had not [sic] been sitting as the trier of fact, it would have weighed the evidence differently. Anderson v. Bessemer City, N.C., 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
Issues of negligence and causation in admiralty cases are treated as fact questions. Johnson v. Offshore Exp., Inc., 845 F.2d 1347, 1352 (5 Cir.1988), certiorari denied sub nom. Offshore Exp., Inc. v. Johnson, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). Under maritime law proximate cause requires proof of direct and substantial cause which in a direct unbroken sequence produces the injury complained of and without which such injury would not have happened. Alverez v. J. Ray McDermott & Co., Inc., 674 F.2d 1037, 1043 (5 Cir.1982); Olympic Towing Corp. v. Nebel Towing Co., 419 F.2d 230, 233 (5 Cir.1969), certiorari denied sub nom. Nebel Towing Co. v. Olympic Towing Corp., 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970). A court sitting in admiralty apportions damages in accordance with principles of comparative negligence. Vulcan Materials Co. v. Vulica Shipping Co., Ltd., 859 F.Supp. 242, 250 (W.D.La.1994).
The first witness to testify was Captain Jerry Soileau. Captain Soileau testified that on June 2, 1995, he was employed as a boat captain by 5-J’s Towing. On that date, Soileau was temporarily assigned to the M/V REBEL. Soileau testified that he did not witness plaintiffs accident. He stated that plaintiffs accident was not reported to him until the next day. Witnesses to the accident reported to him that the M/V STORMY V passed by and was traveling too fast. According to information on the activity log, on June 2, 1995, plaintiff was fixing a broken face wire between 8:45 p.m. and 9:50 p.m. Soileau testified that he was not at the wheel of the M/V REBEL when the face wire broke. He instructed plaintiff and another worker to replace the face wire, and then Soileau went downstairs to the galley and was there at the reported time of the accident. He stated that Dean Johnson was at the wheel at the time. He admitted that Johnson was not a licensed operator of that boat or any boat.
On cross-examination, Soileau stated that in the injury report that was complet *55 ed by him, he wrote that plaintiff told him that he was pulling on the cable and his foot slipped. He said that during the time that the face wire was being changed by plaintiff, he did not notice any excessive movement of the M/V 17REBEL. He testified that if another boat passes by twenty-five to thirty feet away going too fast, he would feel it on his boat. Soileau said in that situation, you can hear the other boat passing and hear the barges clanging, and none of that happened on the night of the accident.
On redirect examination, Soileau testified that it takes two people to change a starboard face wire. He said it was common practice for deckhands and crewmem-bers to change face wires. He said that when Dean Johnson was at the wheel of the MTV REBEL, the vessel was not underway and was tied up in the fleet.
The next witness was Mr. Wilson Le-beouf, Jr. Mr. Lebeouf testified that he was one of the owners of 2-W Towing on June 2, 1995. On that date, Lebeouf was the captain of the M/V STORMY V. He got off of the boat at noon that day, so he did not witness the plaintiffs accident that occurred at approximately 9:00 p.m. that evening.
Following the testimony of Wilson Le-beouf, Jr. was the testimony of Will Le-beouf, the son of Wilson Lebeouf, Jr. He testified that the log indicated that the M/V STORMY V stopped to dump some garbage at the Hollywood Marine Fleet at approximately 10:00 p.m. on June 2, 1995. He stated that to get to the Hollywood Marine Fleet, the M/V STORMY V had to pass by the National Marine Fleet. He stated that he navigated the M/V STORMY V past the fleet at 4:00 a.m. that morning, but he offered no testimony to indicate that he had any personal knowledge of the particular incident in which the M/V STORMY V allegedly |Rpassed the fleet at the time of the plaintiffs accident around 9:00 p.m. that evening.
On cross-examination, Lebeouf stated that at no time on the evening of June 2, 1995 did the M/V STORMY V go too fast as it traveled Carpenter’s Bayou.
Dean Johnson, the next witness, testified that on June 2, 1995, he was working as a deckhand for 5-J’s Towing on the M/V REBEL. He stated that he was visiting with Captain Soileau in the wheelhouse when the face wire broke. He testified that he was also in the wheelhouse when plaintiffs accident occurred, but that Soileau had gone to the galley to get something to eat. He heard about plaintiffs accident the same day, but did not mention it to Soileau until the next morning. Johnson initially stated that Soileau did not come up to the wheelhouse or anywhere on deck immediately after the accident. However, after being presented with his earlier deposition testimony, Johnson stated that Soileau went to plaintiff immediately after plaintiff started yelling after hurting his foot. This testimony differs from Soileau’s testimony that he knew nothing of the accident until the following morning.
Johnson also testified that in replacing a face wire, the old face wire has to be removed and often goes into the water even though a deckhand tries not to let that happen. He said it is not unsafe for one person to change a face wire without assistance, but it is easier for two people working together to accomplish this task. He said it was standard practice for a deckhand to climb up a push knee in order to pick up the old wire and drag it onto the vessel. However, he stated that it is very | aunsafe to sit on top of the push knee when changing a face wire, which is where he saw plaintiff seated right after the accident.
*56 Johnson testified that he saw plaintiffs accident from the wheelhouse. He later clarified that he first became aware that plaintiff had been hurt when he heard him hollering after his foot was crushed. Although a signature purporting to be his is on the accident report, Johnson said that Soileau signed it for him with his permission. When asked if he agreed that the cause of the accident was the WV STORMY V passing the fleet too fast, Johnson responded that he knows that a barge passed but he could not say what the name of the boat was that was pushing the barge. He agrees that the passing boat was traveling too fast, and he testified that he believed that was the cause of plaintiffs accident. According to Johnson, before the vessel passed, the M/V REBEL’S push knees were right up against the barge with no space between them. As the other vessel was passing, it sucked out the water and caused the M/V REBEL to “swing,” creating a separation between the barge and the starboard push knee of the M/V REBEL. He testified that the other vessel was ten to fifteen feet away from the M/V REBEL when it passed. Johnson said the two things that affect the movement of barges and boats in the fleeting area are the speed of the vessel going by and the closeness of that vessel to the barges and boats in the fleet.
He said the standard practice for a boat passing a fleet is to reduce speed to very low and pass by as far away from the fleet as possible. He added that if men are working in the fleet, the speed of the passing vessel should be reduced even |inmore. Johnson said there is generally a “no wake zone” around a fleet. He said that it is impossible to go through Carpenter’s Bayou without creating a wake or suction. He also stated that the surging from the passing boat was no greater than the ordinary bumping and rocking that occurs while working in the fleet.
The plaintiff, William Wright, was the next witness who testified. He stated that he had been working as a deckhand for 5-J’s Towing for one year when the accident occurred. He said that on the night of the accident, he responded to a request to assist another worker in replacing a broken face wire. Plaintiff started the job alone because the other worker was still finishing another task. When removing the broken face wire, part of it fell in the river. In his efforts to remove the broken face wire, he climbed up the push knee and put one foot on the barge and the other foot on the ladder on the backside of the push knee. When he reached down to grab the end of the wire that he had threaded through a hole, his foot was smashed between the barge and the push knee. As his foot was being smashed, he looked up an observed a vessel, the M/V STORMY V, passing near his position.
He waved to Johnson in the wheelhouse to put the starboard engine in reverse so he could get his foot out. He said the M/V STORMY V was about twenty-five feet away from the M/V REBEL when it passed. He also said the M/V STORMY V passed too quickly.
On cross-examination, plaintiff said that his foot was not between the barge and the boat until after the M/V STORMY V passed by. He said that the passing In of that boat caused a separation of his boat and the attached barge, and his foot either slid off of the top of the barge to the area between the push knee and the barge or the barge separated from his foot, or both. Plaintiff was bending over to reach the wire when this separation occurred, and he said he was unaware that his foot was not still on the barge until his foot was smashed between the barge and the push knee when the boat and barge came back together. He said that he was paying *57 attention to the job he was performing, rather than the position of his foot. He said the movement of the M/V REBEL was so subtle that he did not know it had moved.
Plaintiff acknowledged that he was aware that passing boats often cause movement in the water, which can also cause movement on boats and barges in the fleeting area. He estimated that the M/V STORMY V was traveling four to five miles per hour, and his opinion is that speed was slightly too fast for a passing vessel in that area. Plaintiff said that the passing of the M/V STORMY V caused a two to three foot wake. He said he did not see a barge with the passing vessel.
Plaintiff said that the task of replacing the face wire is generally a two-person job, but one person can accomplish this task. He admitted that if he had waited for the other worker to complete his task, he could have handed the broken face wire to the other man rather than pulling the face wire by himself from one point to another. However, plaintiff denied that the accident would not have occurred if he had waited for the other worker to assist him in replacing the face wire. This testimony contradicted his earlier deposition testimony. Plaintiff stated |12that he considered himself to be an experienced deckhand. He admitted that he was hurrying to complete the replacement of the face wire because he wanted to go watch television or go to bed.
On redirect examination, plaintiff testified that at the time he was injured, his regular schedule was fourteen days on and seven days off. He agreed that this translated into eight actual months of work as a deckhand over a one-year period. He said that the face wire he was changing at the time of the accident was the third face wire that he had changed since becoming a deckhand.
On recross-examination, plaintiff explained his earlier testimony that the replacement of a face wire is generally a two-person task. Plaintiff said that one person can remove the old face wire, but the replacement of the new wire generally requires two people. Plaintiff was still engaged in the removal of the old face wire when the accident occurred.
Brian Sudduth testified by deposition. Sudduth was working as a dispatcher for National Marine on the night of June 2, 1995. He did not witness plaintiffs accident, but he heard about the accident that evening. He remembers being told that the accident occurred when the M/V STORMY V was going by, but he could not recall who told him. He said he frequently received complaints about vessels in the Hollywood Marine fleet traveling too fast at that part of Carpenter’s Bayou. On the night of the accident, Sudduth saw the M/V STORMY V pass and said it “was going by pretty quick.” He estimated the speed at six to seven miles per hour. He recalled that someone aboard the M/V REBEL called to the M/V |iaSTORMY V on the radio and said, “Hey, guys, you need to slow it down!” He did not recall hearing. a response from the M/V STORMY V. Sudduth did not contact the M/V STORMY V even though he heard the radio complaint about its speed. He said that a boat moving through the water is going to produce some wake, even though it is small. He defined an excessive wake as anything that creates waves and causes barges to shift around. He said if a boat comes through the fleet area “on a slow bell,” it does not create waves and creates only a slight movement, as in a barge gently moving back and forth. His opinion is that if the movement of a boat or barge from the wake were so subtle as to be non-discernible, he would not consider that wake excessive.
*58 Sudduth said that the M/V STORMY V was approximately thirty feet from the M/V REBEL when it passed. He said the person in the wheelhouse of a boat is responsible for watching out for oncoming traffic and warning crewmembers on the deck.
In its brief, 2-W Towing repeatedly states that a wake created by a passing vessel that causes movement of another vessel that is so subtle as to be not discernible to those on board cannot be considered to be an excessive wake. 2-W Towing argues that it is not enough for plaintiff to prove that the M/V STORMY V was traveling too fast and too close to the plaintiffs vessel; the plaintiff must also prove that negligent operation of the M/V STORMY V caused an unreasonably excessive effect on the M/V REBEL.
|14Both 2-W Towing and plaintiff cite this Court’s decision in Koepp v. Sea-Land Service, Inc., 93-2562 (La.App. 4 Cir. 11/17/94), 645 So.2d 1269. In Koepp, this Court, citing New Orleans Steamboat Co. v. M/T Hellespont Glory, 562 F.Supp. 391 (E.D.La.1983), stated the duty of a vessel when passing a dock as follows:
A ship passing piers or docks where other vessels are tied up is obligated to proceed carefully and prudently so as to avoid creating unusual swells or suction which would damage craft properly moored or installations along the shoreline. The moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water and must take such precautions by way of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage, (citations omitted).
Id. at p. 10, 645 So.2d at 1275.
Although the present case involves injuries to a deckhand on the moored vessel, rather than damage to the vessel itself, we find that the same principles apply with regard to the duty of the passing vessel. By finding 2-W Towing 50% liable in this accident, the trial court obviously found that the M/V STORMY V was the vessel that caused the wake leading to plaintiffs accident, and that this wake caused an unreasonably excessive effect on the M/V REBEL. Even though the trial court did not issue reasons for judgment, we can assume that the trial court found that the M/V STORMY V passed the National Marine Fleet either too fast, too close, or both.
Under the clearly erroneous standard of review that is applicable in this case, we must determine if the trial court’s findings are plausible in light of the entire record. Wood v. SubSea International, Inc., 99-1320 (La.App. 4 Cir. 3/29/00), 766 So.2d 563, writ denied, 2000-1237 (La.6/16/00), 765 So.2d 336. We may not reverse even if we would have weighed the evidence differently if we had been the trier of fact. Id.
The trial court was presented with testimony from witnesses that sometimes contradicted themselves as well as contradicting other witnesses. The court was in the best position to evaluate the credibility of the witnesses and determine how much weight to give to each witness’ testimony.
The plaintiff testified that right after his foot was hurt, he observed the M/V STORMY V passing through Carpenter’s Bayou near the National Marine Fleet where the M/V REBEL was tied up. Brian Sudduth did not witness the accident, but he saw the M/V STORMY V pass on the night of the accident. Will Lebeouf of 2-W Towing testified that the company logs confirmed that the M/V STORMY V was in the area of the National Marine Fleet on that evening. The 2-W Towing records indicated that the M/V STORMY *59 V stopped to dump garbage at the Hollywood Marine Fleet at approximately 10:00 p.m., and that the M/V STORMY V had to pass the National Marine Fleet to get to the Hollywood Marine Fleet. Captain Soi-leau testified that 5-J’s Towing’s records indicate that plaintiff was fixing the broken face wire between 8:45 p.m. and 9:50 p.m. No witness was able to refute plaintiffs assertion that the passing vessel was the M/V STORMY V. The time approximations listed in the 2-W Towing and 5-J’s Towing logs do not contradict plaintiffs claim that the passing vessel was the M/V STORMY V.
| t (¿Plaintiffs testified that the passing vessel was the M/V STORMY V. None of the other witnesses adequately refuted plaintiffs testimony on that issue. The trial judge apparently believed plaintiffs testimony on that issue, and we find no reason to challenge that credibility determination.
The next issue to be addressed is whether the M/V STORMY V proceeded carefully and prudently past the fleet so as to avoid unusual swells or suction that could cause damage in the fleeting area. Wilson Lebeouf, Jr., the captain of the M/V STORMY V, was not on the boat at the time of the accident, so his testimony is not relevant to this issue. His son, Will Lebeouf, had no personal knowledge of the plaintiffs accident, but he stated that at no time on the evening of June 2, 1995 did the M/V STORMY V go too fast as it traveled past the National Marine Fleet.
Dean Johnson said he saw a passing boat traveling too fast past the fleet, but he could not identify the boat and said it was a tugboat pushing a barge. The M/V STORMY V was not pushing a barge at the time of the accident. He first stated that he witnessed plaintiffs accident, and then said he only became aware of plaintiffs accident after he heard plaintiff screaming. Johnson contradicted himself several times during his testimony and his deposition testimony often conflicted with his trial testimony. Even though the absence of written reasons for judgment makes it difficult for this Court to determine how the trial court assessed the credibility of the witnesses, we can only assume that the trial court did not rely on the testimony of Dean Johnson due to its many contradictions, and neither will we.
17The plaintiff testified that when he looked up and saw the M/V STORMY V after his foot injured, he noticed that the boat was traveling too fast for a vessel passing a fleet, and that the passing caused a two to three foot wake. Brian Sudduth corroborated plaintiffs testimony when he stated that he saw the M/V STORMY V passing by on the night of the accident and that it “was going by pretty quick,” estimating the speed at six to seven miles per hour. Over the radio, Sud-duth then heard someone from the M/V REBEL contact the M/V STORMY V and say, “Hey, guys, you need to slow it down.” Sudduth, the dispatcher for National Marine, stated that he defined an excessive wake as anything that creates waves and causes barges to shift around. He distinguished that from a wake that just causes barges to gently move.
The fact that the witnesses aboard the M/V REBEL did not notice any excessive movement of the vessel when the M/V STORMY V passed does not necessarily mean that the wake caused by the M/V STORMY V could not have caused the M/V REBEL and its barge to shift around significantly. After considering all of the evidence, we find that the issue of whether or not the M/V STORMY V was traveling too fast or too close past the fleet such that it created an unusual swell or suction is a close call. However, the trial court’s finding of liability on the part of 2-W *60 Towing for the operations of the M/V STORMY V is plausible in light of the record viewed in its entirety. Because that is our standard of review, we will not reverse the trial court’s finding that 2-W Towing is 50% liable for plaintiffs injuries.
| ^Turning now to the issue of plaintiffs liability for this accident, the record strongly supports a finding that plaintiff bears some responsibility for the accident that caused his injuries. The evidence is undisputed that the replacement of a broken face wire is a task that is best suited for two people. Captain Soileau assigned plaintiff and another deckhand to accomplish this task together, but plaintiff chose to start the process alone because the other worker was still occupied with another task. In removing the old face wire alone, the plaintiff put himself in danger by attempting to keep one foot on the M/V REBEL and the other on the attached barge at the same time. Plaintiffs testimony shows he was inattentive in performing this task and unwilling to wait for assistance.
A Jones Act seaman is obligated to act with ordinary prudence under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997). The circumstances of a seaman’s employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. Id. at 339. The evidence shows that Captain Soileau instructed plaintiff to replace the broken face wire with the assistance of another deckhand. The unsafe conditions in which plaintiff attempted to change the face wire were created by the plaintiff in not waiting for the available assistance. These unsafe conditions cannot be imputed to the employer given the fact that the plaintiff disregarded Captain Soileau’s instructions as to how to perform this task. Plaintiff had been a deckhand for one year and had changed other face wires | ^successfully. Clearly, plaintiff had the experience and training to do this job safely and properly.
Based on the evidence of plaintiffs failure to act with ordinary prudence under the circumstances, we find no error in the trial court’s finding that plaintiff was 50% liable for the accident that caused his injuries.
We find no merit in 2-W Towing’s assertion that 5-J’s Towing should be held liable for this accident. 2-W Towing argues that 5-J’s Towing’s liability stems from the fact that the M/V REBEL was not under the command and control of a licensed captain and there was no lookout posted. 2-W Towing cites cases requiring that a vessel be under the control of a licensed operator whenever it is underway or moving. In this case, it is undisputed that the M/V REBEL was not underway and was, in fact, tied up to the fleet.
The standard of care attributable to an employer is ordinary prudence under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997). There is no evidence establishing that 5-J’s Towing did not act with ordinary prudence for a vessel that was not underway. Because the judgment is silent as to 5-J’s Towing, the trial court obviously found that 5-J’s Towing was not liable for this accident. We find no error in that ruling.
The next issue to be addressed is the trial court’s award to plaintiff of $71,350.00 in future lost wages, subject to a reduction for plaintiffs percentage of fault. 2-W Towing argues that the trial court erred in awarding future lost wages to plaintiff, and plaintiff argues that he is entitled to an increase in this award.
| MDr. Melville Wolfson, an expert in economics, calculated plaintiffs future wage *61 loss, with a return to minimum wage employment, to be $71,350.00. Dr. Wolfson compared the wages earned by plaintiff as a deckhand with minimum wage. 2-W Towing argues that Dr. Wolfson merely provided a calculation based on an assumption that plaintiff can only return to minimum wage employment, and this assumption did not relieve plaintiff of proving that he is only capable of minimum wage employment.
Plaintiffs neurosurgeon, Dr. David Jar-rott, testified by deposition that plaintiff has a 10% anatomical disability as a result of his back surgery. Although he acknowledged that it is “not out of the realm of possibility” for plaintiff to return to a heavy labor job, his opinion is that, given plaintiffs current physical condition, plaintiff should not engage in employment that requires jumping, climbing, bending or lifting more than twenty-five pounds of weight. Dr. Jarrott stated that with reconditioning, plaintiff can probably return to light to medium work. He testified that plaintiff is permanently disabled from deckhand duty.
The testimony of Dr. Jarrott, establishes that plaintiff is restricted in the type of employment he can pursue due to his accident-related injuries. Given the physical restrictions assigned to plaintiff by Dr. Jarrott, and considering plaintiffs limited education (8th grade) and prior work experience, the record supports a finding that plaintiff is currently only capable of securing minimum wage employment. We find no error in the trial court’s award of future lost wages to plaintiff.
| ¡,,, Plaintiff argues that the award for future lost wages should be increased to include fringe benefits received while working aboard the MW REBEL, i.e. meal costs. Plaintiff claims that he should also be compensated for loss of these fringe benefits. 2-W Towing responds to this claim with the argument that plaintiff did not prove that he will not receive fringe benefits from any future employment for which he is qualified. The record supports 2-W Towing’s argument on this issue. In the absence of any evidence regarding whether or not fringe benefits, such as meal costs, would be included in potential future jobs, plaintiff is not entitled to this element of damages.[3]
Plaintiff also argues that his award for past lost wages should be modified to include loss of fringe benefits, i.e. meal costs. Dr. Wolfson calculated loss of past fringe benefits at $8,213.00. Dr. Wolfson stated in his report that his calculations assumed the plaintiff was provided meals for the time he spent on the MTV REBEL. Although there are numerous references to the galley of the vessel, plaintiff did not offer any evidence showing that meal costs were included in his employment. This element of damages could have been established through plaintiffs own testimony, but no testimony was presented on this issue. Again, in the absence of any evidence that plaintiff received fringe benefits as part of his employment, there was no error on the part of the trial court in not awarding damages for loss of past fringe benefits.
*62 | ¡«The trial court awarded plaintiff $150,000.00 for pain and suffering. Plaintiff argues that this award is unreasonably low and should be increased. 2-W Towing argues that this award is excessive and should be reduced.
Plaintiff alleged that he suffered injuries to his foot and lower back as a result of the accident. Dr. Jarrott related the lower back injury to the accident. The back injury resulted in the surgical procedure of discectomy at L-5/S-1, with foraminotomy or enlargement of the left L-5/S-1 fora-men. As a result of the surgery, Dr. Jarrott assigned plaintiff a 10% percent disability of the body as a whole.
Dr. Kenneth Adatto, an orthopedic surgeon, treated plaintiff for his foot injury, which he related to the accident. He also noted that plaintiff complained of a back injury allegedly suffered in the accident. Dr. Adatto testified by deposition that plaintiff came to him two weeks after the accident, with his left foot in a short-leg fiberglass cast that had been put on during plaintiffs emergency room visit the day after the accident. Dr. Adatto removed the cast and found that the left foot was swollen. He diagnosed that plaintiff was suffering from a condition called reflex sympathetic dystrophy, which includes symptoms of swelling, coolness, and redness and excess heat reaction. These symptoms can be exacerbated by anxiety and tension. Dr. Adatto treated this condition with medication. His opinion was that plaintiffs foot problems were resolved by August of 1996.
Plaintiff says he complained of back pain, in addition to his foot injury, in the emergency room on the day after the accident, although there is no such | annotation in the emergency room records. Plaintiff did complain of back pain to Dr. Adatto two weeks after the accident.
When asked why there was a six-month gap between the times he stopped seeing Dr. Adatto and started seeing Dr. Jarrott for back pain, plaintiff explained that his back pain was increasing during that period. As his pain increased, he again sought medical attention for back pain. He testified that he still had pain and was still taking pain medication.
Based on the record before us, we cannot say that the award of $150,000.00 to plaintiff for pain and suffering was an abuse of the discretion. We do not find this award to be excessive or inadequate.
Finally, 2-W Towing argues that the trial court erred in awarding prejudgment interest on the awards for future losses, and abused its discretion in awarding prejudgment interest on past losses. Plaintiff argues that the trial court erred in failing to award prejudgment interest from the date of occurrence instead of from the date of judicial demand.
The trial court had the discretion to grant plaintiff prejudgment interest on the sums awarded as past damages in his general maritime and Jones Act claims. Milstead v. Diamond M Offshore, Inc., et al., 95-2446 (La.7/2/96), 676 So.2d 89. We find no abuse of that discretion on this part of the award. 2-W Towing argues that this case presents “peculiar circumstances” under which no judicial interest should be awarded on past damages. In Brodtmann v. Duke, 96-0257, p. 10 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, 454, this Court noted that under federal laJaw, the trial court has the discretion to deny prejudgment interest from the date of loss only when there are “peculiar circumstances” that would make it inequitable for the losing party to be forced to pay prejudgment interest. 2-W Towing argues that “peculiar circumstances” exist in this case because there was no proof that it was negligent in this accident. Because we *63 have found otherwise, we find no merit in this argument.
Although the trial court had the discretion to award prejudgment interest for past damages, it had no authority to grant prejudgment interest on the damages award for future losses in this matter. Milstead v. Diamond M Offshore, Inc., et al., 95-2446 (La.7/2/96), 676 So.2d 89. Therefore, we will reverse the portion of the judgment awarding prejudgment interest on future damages. However, because the $150,000.00 general damages award for pain and suffering was not apportioned into past and future components, we will remand this matter to the trial court for apportionment of this award, and recalculation of the interest awards. See Walton v. Cooper/T.Smith Stevedoring, 97-0100 (La.App. 4 Cir. 3/4/98), 709 So.2d 941.
In arguing that prejudgment interest should be awarded from the date of occurrence rather than from the date of judicial demand, plaintiff states that federal maritime law provides for interest from the date of occurrence. The date at which prejudgment interest attaches depends on whether the plaintiff recovers under federal or state law. Under federal law, prejudgment interest is awarded from the date of injury; under state law, prejudgment interest is awarded from date of judicial demand. La. R.S. 13:4203; Brodtmann v. Duke, 96-0257, p. 10 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, 454.
In this case, the trial judge awarded interest from the date of judicial demand, the appropriate date that interest attaches under state law. However, 2-W Towing was held liable to plaintiff under general maritime law. Prejudgment interest is awarded from the date of loss under general maritime law. Mayo v. Nissan Motor Corp. in U.S.A., 93-852 (La.App. 3 Cir. 6/22/94), 639 So.2d 773. As such, the trial court should have awarded plaintiff prejudgment interest from the date of injury for his past damages. We have already stated that this case does not present the “peculiar circumstances” necessary to deny the trial court its discretion in awarding prejudgment interest for past losses. The portion of the trial court judgment awarding interest from date of judicial demand will be amended to award interest from the date of injury, June 2, 1995, for damages awarded for past losses. As we stated earlier, this case is being remanded for an apportionment of the general damages award into past and future components.
For the reasons stated above, the trial court judgment is hereby amended to cast 5-J’s Towing and National Marine, Inc., rather than 2-W Towing, in judgment for the award to plaintiff of unpaid maintenance. The award of prejudgment interest on future losses is reversed. The judgment is amended to award interest from the date of injury for all past losses. We remand to the trial court for an apportionment of the $150,000.00 general damage award into past and future components, for the calculation of prejudgment interest as to all past losses from 1 P.Bdate of injury, and for the calculation of post judgment interest as to all losses, past and future. In all other respects, the trial court judgment is affirmed.
AMENDED IN PART; REVERSED IN PART; AFFIRMED IN PART; REMANDED.

. Defendants National Marine Inc. and 5-J's Towing, Inc. were not cast in judgment.

. At the oral argument in this matter, the attorney for 5-J's Towing, Inc. and National Marine, Inc. admitted that the maintenance award should have been assessed to them, rather than to 2-W Towing, Inc.

. In Dr. Wolfson's report, he states. "There is no assurance that your client's securing alternate employment would result in another employer's providing the same monetary dollar contributions to fringe packages. Data reported by the United States Department of Labor suggest that fringe benefit coverage varies by the type of firm, size of firm, type of industry, and type of occupation. Without specific information about the employer for whom your client might expect to work, one is unable to ascertain a value which may be used to adjust fringe contribution loss.”