STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-26 c/w 06-27

LOUISE BULLOCK

VERSUS

THE RAPIDES FOUNDATION D/B/A RAPIDES REGIONAL MEDICAL
CENTER

CONSOLIDATED WITH

WALTER RANDALL

VERSUS

THE RAPIDES FOUNDATION D/B/A RAPIDES REGIONAL MEDICAL
CENTER

**********
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NOS. 211,880 & 214,909
HONORABLE B. C. BENNETT, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, Michael
G. Sullivan, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED.**

Thibodeaux, C.J., concurs in part and dissents in part with written reasons.
Amy, J., dissents with written reasons.
Sullivan, J., dissents for the reasons assigned by Judge Amy.

**George A. Flournoy**
**Flournoy & Doggett (APLC)**
**Post Office Box 1270**
**Alexandria, LA 71309-1270**
 **COUNSEL FOR PLAINTIFF/APPELLEE:**
  **Louise Bullock**

**Brandon A. Sues**
**Eugene J. Sues**
**Michael J. O'Shee**
**Gold, Weems, Bruser, Sues & Rundell**
**Post Office Box 6118**
**Alexandria, LA 71307-6118**
 **COUNSEL FOR DEFENDANT/APPELLANT:**
  **The Rapides Foundation**

**PICKETT, Judge**.

## FACTS

On April 8, 2002, Louise Bullock, an eighty-year-old retired teacher, along with her daughter, Jan Reich, accompanied another of her daughters to the Rapides Regional ER. Louise Bullock's other daughter, Beverly Merchant, now deceased, suffered from chronic asthma and was in the midst of an asthma attack. Ms. Bullock had already taken Beverly to her primary care physician's clinic that day, but Beverly's condition worsened at home, and Ms. Bullock was now rushing her to the ER. Beverly was pale and gasping for breath, and her oxygen level was in the eighties. Ms. Bullock and Jan answered questions for Beverly in triage. Beverly was wheeled into an examination room of the ER by a nurse. Jan and Ms. Bullock followed, pursuant to the hospital's policy of allowing two visitors per patient into the examination room. Jan put the coats and purses she carried onto the only straight back chair in the room, and Ms. Bullock put her coat and purse there too. The nurse helped Beverly into the bed, administered a preliminary examination, and left the room. Ms. Bullock, exhausted, saw one available seat near the head of the patient bed, a rolling physician's stool. The stool had no back and no arms.

Ms. Bullock attempted to sit on the rolling stool as she had sat on similar stools in the past. However, the stool immediately rolled out from under her and slammed into the wall as soon as the backs of her legs touched the stool. Ms. Bullock was already in a sitting position and could not prevent her downward motion. She fell to the floor and struck her head on a cabinet, blinding her for a couple of moments. She sustained a cerebral concussion. At the time of trial three years later, Ms. Bullock still had a knot behind her right ear where she struck the cabinet. Ms. Bullock also

sustained significant contusion injuries to her right hip. She was taken through triage herself and was put in an examination room next to her daughter's.

Ms. Bullock was ultimately left with a permanent balance problem that caused her to become dependent for the first time on a cane and later on a walker. She had been a very active retiree, serving as councilwoman, president of her garden club, active gardener, producer of youth plays, and she enjoyed walking and riding a bicycle daily in summer and enjoyed ballroom dancing with her husband. After the accident, she was unable to resume these activities.

Prior to Ms. Bullock's fall on April 8, 2002, Rapides Regional ER had eight reported incidences of similar falls to the floor involving these rolling physician's stools in less than three years. Two incidents occurred on the same day, June 2, 1999, in two separate examination rooms of the ER, when two different visitors attempted to sit on two different rolling stools. One of these visitors fell against a glass cabinet and shattered the glass, resulting in shoulder and neck pain. Three incidents occurred in 2000. On February 22, 2000, a visitor in an examination room attempted to sit on a rolling stool and fell to the floor when the stool slipped from underneath him. On March 6, 2000, another visitor tried to sit on a rolling stool and fell to the floor when it rolled backward. On May 3, 2000, yet another visitor attempted to sit on a physician stool when it rolled backward, and she fell on her hip and then her right shoulder, resulting in pain in both areas. On June 7, 2001, a visitor again tried to sit on a doctor's stool in an ER room and fell to the floor as the stool rolled out from under her. On August 1, 2001, another visitor fell off of the stool in an exam room in the ER. This time, the visitor had been told not to sit on the stool, but he did so anyway. The eighth incident occurred on March 24, 2002, two weeks before Ms.

2

Bullock's accident, when the stool rolled out from under a visitor while she was attempting to get up, causing her to hit her bottom on the floor and hit her head on a crash cart. She had to be assisted off the floor and into a wheelchair and had complaints of back pain.

Accordingly, Ms. Bullock's fall in April 2002 was the ninth reported fall from a rolling physician stool since June of 1999 when the hospital began maintaining a data base for these incident reports. Additionally, the record contains reports of four similar falls by visitors *after* Ms. Bullock's fall in 2002, with three incidents occurring in 2003 and one occurring in 2005.

While Ms. Bullock testified that there was no warning label on the stool in her daughter's room, there was testimony that other stools in the ER had warning labels and that nurses were known to tell patients to be careful when sitting on the stools. There was also testimony that the labels on the stools were placed there not to warn of danger, but only to preserve them for use by physicians and medical staff so that the stools would be available when the medical personnel needed them.

Finding that the rolling stools were dangerous and that Rapides Regional had a duty to either put a warning or a wheel-locking mechanism on the rolling physician stool, the trial judge ultimately awarded Ms. Bullock $4,063.40 in special damages and $30,000.00 in general damages plus legal interest. The trial court assessed fault at fifty percent (50%) to Ms. Bullock and fifty percent (50%) to Rapides Regional. The final judgment to Ms. Bullock awarded her a total of $17,031.70 plus legal interest. Rapides Regional appealed the judgment, and Ms. Bullock answered the appeal.[1]

---

[1]A companion case, *Randall v. The Rapides Foundation, D/B/A Rapides Reg. Med. Center*, 06-27, was appealed also. However, issues were neither submitted nor briefed. Thus, it is

## ASSIGNMENTS OF ERROR

The appellant, Rapides Regional, asserts five assignments of error:

1.    The trial court committed legal error in finding Rapides Regional had a duty to warn.

2.    The trial court committed legal error in misapplying the law of "design defect" and finding Rapides Regional breached a nonexistent "duty" to provide a locking mechanism for the rolling stool.

3.    The trial court committed prejudicial legal error in admitting and relying upon inadmissible evidence of dissimilar incidents having no probative value.

4.    The trial court erred in relying on its own speculation.

5.    The trial court was manifestly erroneous in finding Rapides Regional at fault.

Answering the appeal, the appellee Ms. Bullock argues that the allocation of fault is erroneous.

## DISCUSSION

**Standard of Review**

The manifest error standard of review is the proper standard to be applied in cases involving findings of unreasonable risks of harm or unreasonably dangerous defects. *Reed v. Wal-Mart Stores, Inc.,* 97-1174 (La. 3/4/98), 708 So.2d 362. Thus, an appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two-tiered test must be applied in order to reverse the findings of the trial court:

> a.    the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

---

abandoned.

4

b.     the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finder's, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.

**Reports of Prior Occurrences**

We will first address the assignment of error by Rapides Regional that the trial court improperly admitted reports of prior incidents involving rolling stools in the Rapides Regional ER. As indicated in the factual section above, the record contains reports of eight visitors falling in connection with these rolling physician stools in the examination rooms of Rapides Regional's ER department between June 1999 and March 2002, prior to the accident that caused Ms. Bullock's injuries on April 8, 2002. The record also contains four post-injury incident reports. Rapides Regional contends that the reports are inadmissible because they are dissimilar, lack sufficient information to allow comparison with Ms. Bullock's incident, and have no probative value. Specifically, Rapides Regional contends that the reports did not show the

5

physical or mental state of the person involved, the method used in attempting to sit on the rolling stool, the characteristics of the rolling stool involved, the person's eyesight, and whether the person knew the stool had wheels before sitting on it.

Louisiana courts have found that evidence of prior accidents is admissible for the limited purpose of showing that a thing or place was dangerous and that the defendant knew of the dangerous condition. "[T]he prior accidents must be closely related in circumstance to the injury or hazard at issue." *Davis v. Louisiana Power & Light Co.*, 612 So.2d 235, 239 (La.App. 4 Cir. 1992), *writ denied*, 615 So.2d 336 (La.1993). "[T]o be relevant, the other accidents should occur at substantially the same place and under substantially the same conditions and must be caused by the same or similar defect, danger, act or omission." *Lee v. K-Mart Corp.*, 483 So.2d 609, 613 (La.App. 1 Cir.1985), *writ denied*, 484 So.2d 661 (La.1986); *Brodtmann v. Duke*, 1996-0257 (La.App. 4 Cir. 2/11/98), 708 So.2d 447, *writs denied,* 98-0645, 98-0658, 717 So.2d 1177-78 (La. 4/24/98), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541 (1998).

In the present case, all of the accidents reported occurred in Rapides Regional's ER department examination rooms, which exist for the purpose of treating patients in some kind of distress, and accommodating those who bring them in. The rooms had all been similarly furnished with a patient bed, one straight back chair, and one physician's rolling stool. The hospital's policy throughout the ER was to allow two visitors with each patient admitted to its examination rooms therein. All of the persons who fell in connection with these stools were visitors accompanying a patient. This is true of the eight incidents preceding Ms. Bullock's injury and of the four incidents following Ms. Bullock's injury. Of course, the eight incidents

6

preceding Ms. Bullock's accident are the most probative because they indicate the hospital's knowledge of existing conditions at the time Ms. Bullock was hurt. Six of the eight pre-injury incidents occurred when the visitor was *attempting to sit* on a similar stool and it rolled out from under him or her; one was attempting to get up off the stool; and one "fell off" apparently after sitting.

Rapides Regional argues that in one case the person fell off the stool as a result of fainting. However, that isolated incident occurred on April 15, 2005, three years *after* Ms. Bullock's accident and does not affect the eight similar accidents that occurred and were reported *before* Ms. Bullock's injury, and of which the hospital had prior knowledge. Rapides Regional further argues that the picture of the stool attached to the accident report from August 17, 2001 shows a stool of a different design. This is not entirely correct. The stool appears to have four legs instead of five, as in Ms. Bullock's case, but both stools have rollers on every leg and do not have backs or arms to grasp when attempting to sit, while sitting, or when attempting to rise. Testimony indicated that similar physician stools were put in every room. Based upon the foregoing, it is clear that the other accidents occurred at substantially the same place, under substantially the same conditions, and were caused by the same or similar danger. Rapides Regional's assertion of error is without merit.

**Duty To Warn**

Rapides Regional contends that the trial court committed legal error in finding that the hospital had a duty to warn, because the stool was in good condition and did not have a defect according to Rapides Regional's expert, Gerald Whitehouse. Rapides Regional argues that if there is no ruin, vice, or defect, there is no duty to warn and cites *Crittenden v. Fidelity & Cas. Co. of N.Y.*, 83 So.2d 538, (La.App. 2

7

Cir. 1955) and *Madden v. Saik*, 511 So.2d 855 (La.App. 4 Cir.), *writ denied,* 514 So.2d 131 (La.1987).

In *Crittenden,* the plaintiff was a forty-five-year-old carpenter who visited the Warmack residence to discuss a business matter. The owner of the residence, Mr. Warmack, was not at home. The carpenter pulled forward a porch chair, and as he lowered himself onto the front edge of the chair, the base slipped on the smooth waxed concrete surface of the porch, causing him to fall and sustain a serious injury. Eye witnesses to the incident testified that the plaintiff attempted to seat himself on the forward or front edge of the chair, which caused it to tilt forward and slide backward. The plaintiff admitted that he had waxed the Warmack porch floor himself about two weeks prior to the accident. In addressing the questions of whether the chair was inherently dangerous or whether it was improperly used, the *Crittenden* court ultimately determined as follows:

> There are no circumstances in this case which required of the insured special care toward plaintiff. Crittenden entered Warmack's porch of his own accord. He was entirely familiar with the premises, having himself waxed the floor two weeks before and he had not only had occasion to observe the porch chair in question, but had actually seated himself in similar furniture. Obviously, *Mr. and Mrs. Warmack had no more knowledge of any inherent danger in the use of the chair than plaintiff had himself.* There should be, therefore, no reasonable basis for requiring a warning from Mr. or Mrs. Warmack since plaintiff was entirely familiar with the chair and knew that the porch was waxed.

*Crittenden,* 83 So.2d at 540-41 (emphasis added).

*Crittenden,* therefore, is factually distinguishable from the present case because in *Crittenden* there was no evidence of previous accidents or knowledge by the defendants that others had fallen from similar chairs on their porch. As a matter of law, the language in *Crittenden* supports a duty to warn in light of the knowledge possessed by Rapides Regional. More specifically, with regard to knowledge, the

8

*Crittenden* court cited 65 C.J.S., Negligence, § 50, p. 541 and articulated as follows:

> 'The basis of the inviter's liability for injuries sustained by the invitee on the premises *rests on the owner's superior knowledge of the danger*, and as a general rule he is not liable for an injury to an invitee resulting from a danger which was obvious or should have been observed by the invitee in the exercise of reasonable care, or from a *condition which was as well known or as obvious to the invitee as to the inviter*, or which the inviter had no reason to believe would not be discovered by the invitee. *There is no duty to warn the invitee of any defect or danger which is as well-known to the invitee as to the owner or occupant, or which is obvious or which should be observed by the invitee in the exercise of ordinary care.* **However, even though the invitee has knowledge of the danger, or the defect is obvious, the duty of the owner or occupant to use reasonable care to keep the premises reasonably safe for invitees remains, and it runs concurrently with the duty of the invitee to protect himself, so that, where the invitee does not fully appreciate the danger or is without fault, the owner or occupant may be held liable for the injury.'**

*Crittenden,* 83 So.2d at 540 (emphasis added).

Accordingly, unlike Mr. and Mrs. Warmack in the *Crittenden* case, Rapides Regional in the present case had superior knowledge of the conditions on its premises. Rapides Regional knew of eight previous accidents involving their rolling physician stools, while Ms. Bullock had no such knowledge of previous accidents. In fact, she testified that she had sat on rolling stools in hospitals and doctors' offices on several prior occasions without incident. In any event, Ms. Bullock was not as familiar with the stools and conditions at Rapides Regional as the defendant was familiar with its own premises.

While Ms. Bullock knew that the stool had rollers and was intended to roll, she had never had one suddenly roll out from under her in previous locations. Therefore, Ms. Bullock did not fully appreciate the danger, as she would have, had she known that Rapides Regional had had eight prior accidents involving the rolling physician

9

stools in their ER. Moreover, Ms. Bullock testified that if the stool had contained a visible warning of its slippery nature, she would not have sat on the stool. It is the superior knowledge of Rapides Regional of the previous accidents and the dangerous condition of the stools on their premises that created a duty to warn, and it is their breach of that duty that renders them liable for Ms. Bullock's accident.

Rapides Regional also cites *Madden*, 511 So.2d 855, where the plaintiff asserted injuries caused by an uneven differential of five-eighths of an inch in a restaurant's floor. Specifically, the plaintiff sustained a broken ankle when he jumped backward from the top of a table in the restaurant/bar, dropping thirty to thirty-six inches to the floor. There, the defendant's son admitted that he was aware of the uneven spot in the floor. He testified that repairing it had been considered. However, the defect was located in a low-traffic area, and in fifteen years there had been only a couple of complaints about it. Significantly, there was no evidence of any prior harm caused by the uneven spot. Under the circumstances of that case, the court found that the uneven spot did not create an unreasonable risk of harm giving rise to a duty to warn. Accordingly, because there were no previous incidents of harm, *Madden,* is clearly distinguishable from the instant case.

Another case cited by Rapides Regional for the proposition that there is no duty to warn of open and obvious conditions is *Goll v. Bugsy's Bar and Grill, Inc.*, 2003-0475 (La.App. 4 Cir. 3/10/04), 870 So.2d 341. There, a restaurant patron was injured when he tripped on stairs attached to a stage, and the restaurant was not assessed any fault for the injury. Again, there were no reports of previous injuries. In fact, the appellate court upheld the trial court's use of the fact that other people in the party had traversed the stairs without incident in making a determination

10

regarding the risk posed by the steps. Conversely, in the present case, the evidence reveals eight previous incidents in less than three years in the Rapides Regional ER wherein visitors were injured while trying to sit on rolling stools in the examination rooms. Accordingly, in the present case, the hospital had superior knowledge of the risk created by the rolling stools.

**Speculation**

Rapides Regional contends that the trial court erred in relying on its own speculation. This contention is based merely on an observation made by the trial court that "[t]he number of unreported or near missed incidences is unknown. Records of these would be unreported by their nature. . . ." We do not consider this observation a "reliance on speculation." Where the court assessed the content of eight pre-injury reports of similar incidents with rolling stools in the hospital's ER in less than three years, as well as several post-injury reports, and then provided a three page explanation of its findings, it would not be reasonable to conclude that the court "relied" on its own speculation in making factual determinations. This contention is also without merit.

**Allocation of Fault**

The allocation of fault among all negligent parties applies to "any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability," regardless of the basis of liability. La.Civ.Code art. 2323(B); *Dupree v. City of New Orleans*, 99-3651 (La. 8/31/00), 765 So.2d 1002. The trier-of-fact is owed great deference in its allocation of fault. Even if the reviewing court would have decided the case differently, the trial court's judgment should be affirmed unless manifestly erroneous or clearly wrong. *Clement v. Frey*,

11

95-1119 c/w 95-1163 (La. 1/16/96), 666 So.2d 607. In determining percentages of fault, the Louisiana Supreme Court has outlined five factors that may influence the degree of fault assigned: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances that might require the actor to proceed in haste, without proper thought. *Watson v. State Farm Fire & Casualty Ins. Co.*, 469 So.2d 967, 974 (La.1985).

After reviewing these factors in light of the entire record, and after giving appropriate deference to the trial court, we find that the trial court did not commit manifest error in assessing fault at fifty percent to each party.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed. Costs of this appeal are assessed equally to Rapides Regional and Ms. Bullock.

**AFFIRMED.**

12

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-26 c/w 06-27

LOUISE BULLOCK

VERSUS

THE RAPIDES FOUNDATION D/B/A RAPIDES REGIONAL MEDICAL CENTER

(consolidated with)

WALTER RANDALL

VERSUS

THE RAPIDES FOUNDATION D/B/A RAPIDES REGIONAL MEDICAL CENTER

THIBODEAUX, Chief Judge, concurring in part and dissenting in part.

I agree with the imposition of liability, but disagree with the affirmance of the apportionment of fault.

After reviewing the *Watson* factors in light of the entire record, and after giving appropriate deference to the trial court, the trial court and this court are clearly wrong in assessing fault at fifty percent (50%) to each party. More specifically, in considering whether the conduct resulted from inadvertence or involved an awareness of the danger, I conclude that Ms. Bullock's actions were only inadvertent and without awareness of danger while Rapides Regional was fully aware of the dangerous propensities of the rolling stools in the ER due to the eight previous accidents in the ER. Ms. Bullock had sat on rolling stools in hospitals and doctors' offices several times in the past without incident. She touched her legs to the back of the stool and started to sit, which is the normal method for sitting down. At trial, Rapides Regional cross-examined Ms. Bullock about the fact that she had backed up

to the rolling stool. Ms. Bullock agreed that that was correct and then explained that, "[y]ou can't sit on the stool facing the stool."

In assessing fault in *Lemaire v. Airline Lions Club Home, Inc.*, 02-699 (La.App. 5 Cir. 11/26/02), 833 So.2d 464, *writ denied*, 02-3221 (La. 3/14/03), 839 So.2d 44, the trial court determined that the eighty-one-year-old plaintiff had no fault for the fall on the rug because "her act of stepping was a typical act that one would make as one steps away from a table to turn and walk away. . . ." *Id*. at 467. There, the court assessed fault against the defendant at one hundred percent (100%). Therefore, there is jurisprudential support for a similar finding herein. However, in the present case, the trial court found that Ms. Bullock should bear some responsibility for the accident.

In considering the second factor, the risk which was created by the conduct, I again conclude that Rapides Regional created a great risk by not putting warnings on the stools. Rapides Regional knew of the eight prior incidences, particularly of the incident occurring only two weeks prior on March 24, 2002, when a fifty-two-year-old visitor hit her head on a crash cart when the stool started rolling before she could get all the way off of it. Likewise, Rapides Regional knew of the incident on June 2, 1999, when a twenty-seven-year-old visitor fell against a cabinet and shattered the glass in the cabinet when a rolling stool rolled away while she was attempting to sit on it. In both incidents, as well as the incident on May 3, 2000 involving a fifty-four-year-old visitor, the falls to the floor resulted in shoulder, neck, hip, or back pain. Ms. Bullock, on the other hand, knew nothing of the risks, and was simply attempting to sit as she had done in the past.

With regard to the third factor, the significance of what was sought by the conduct, Ms. Bullock was merely attempting to sit after a long day filled with

2

hospital visits and concern for her daughter who was, at the time, gasping for breath. She saw no other place to sit, as the one straight-back chair was covered with coats and purses. Ms. Bullock's conduct was normal under the circumstances. Rapides Regional, on the other hand, sought to leave the stools in order to accommodate the physicians and medical staff in the examination rooms in moving from one task to another. However, armed with prior knowledge, Rapides Regional also sought to ignore the previous incidents, stating that the problem did not merit action given the number of incidents compared to the number of people coming through the ER every year. In essence, it sought to avoid the simple matter of placing warning signs on rolling stools that had previously caused their visitors to hurt themselves, resulting in a ninth incident and serious injury to Ms. Bullock.

In assessing the fourth factor, capacities of the actor, whether superior or inferior, it is clear that Rapides Regional was the superior party and possessed superior knowledge. Under the facts of this case, Rapides Regional knew of the unique situation posed by the existence of the rolling stools in its ER examination rooms before Ms. Bullock's accident. Rapides Regional had knowledge of prior accidents and had filled out eight accident reports in less than three years prior to Ms. Bullock's accident, one of them only two weeks prior. Accordingly, it had superior knowledge and were intimately aware of the danger. On the other hand, Ms. Bullock did not know of the prior accidents at Rapides Regional, and had never had a rolling stool shoot away from her in this manner, even though she had sat upon such stools on several occasions.

Rapides Regional's position was that the rolling stools were for physicians and medical personnel, and that those specialized persons did not require any cautionary warning labels. At trial, Rapides Regional called a physician, the

3

director of its emergency department, Dr. Giroir, to demonstrate how he would sit on the physician's stool in question. Dr. Giroir, who admitted that he had sat on these types of rolling stools "thousands" of times, testified that he would start to lower himself, then reach around behind him and pull the stool underneath him before lowering himself all the way onto the stool. The stool had no arms and no back. The only part available for grabbing was the seat of the stool. This action requires a bit of agility and twisting. Ms. Bullock was eighty years old, and she did not do this. Ms. Bullock is not a specialized medical person, nor were the previous visitors who fell. As the superior actor, Rapides Regional should have acted reasonably to ensure that the premises were safe for all invitees. They had the financial and human resources to apply simple warnings in this case. Notwithstanding its superior capacity, it chose a path of callous disregard. The acts of negligence of Rapides Regional were clearly paramount in comparison to Ms. Bullock's slight inadvertence in failing to hold the stool in place before attempting to sit.

It is apparent that the fifth factor, extenuating circumstances that might require the actor to proceed in haste without proper thought, exculpates Ms. Bullock for the most part in this accident. It was after five o'clock in the evening. Ms. Bullock had taken her chronically asthmatic daughter, Beverly, to her primary care clinic earlier in the day with the instruction that if she did not get better, she should be taken to the emergency room. Beverly's sister, Jan, testified that Beverly had chronic obstructive pulmonary disease. Beverly's condition became worse at home. At the time that Ms. Bullock and Jan brought Beverly to the ER, Beverly was pale and gasping for air. Ms. Bullock and Jan had to answer questions for Beverly in triage. Ms. Bullock was eighty years old and tired and worried. Once the nurse had Beverly in the patient bed, Ms. Bullock looked for somewhere to sit. She saw one

stool near the head of Beverly's bed. By its very nature, the ER invites people in just the condition that this family was in, not at their best and all in the midst of extenuating circumstances. Rapides Regional, on the other hand, was conducting business as normal.

Based upon the foregoing, the record does not support the trial court's and our court's equal allocation of fault to Ms. Bullock and Rapides Regional Medical Center. Once an appellate court finds a clearly wrong apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. *Clement v. Frey*, 95-1119 (La. 1/16/96), 666 So.2d 607.

In *Southern v. Lyons*, 97-19 (La.App. 3 Cir. 5/28/97), 696 So.2d 128, *writ denied,* 97-1729 (La. 10/13/97), 703 So.2d 617, where a thirteen-year-old boy was left unsupervised and was struck by a boat while swimming underwater, this court found that the supervisor was the superior actor in creating the hazardous situation, and that the boy was guilty only of inadvertence in causing the accident. Accordingly, under the facts of that case, we found that the highest percentage of fault that the trial court could reasonably have apportioned to the boy was twenty percent, while the lowest percentage of fault that could have been apportioned to the supervisor was eighty percent. Similarly, in the present case where the hospital had superior knowledge of accidents in its ER involving rolling stools but failed to remedy the situation or at least warn of the danger, and where Ms. Bullock was only slightly inadvertent in attempting to sit on the stool, I would apportion eighty percent (80%) of the fault to Rapides Regional and twenty percent (20%) of the fault to Ms. Bullock.

For the foregoing reasons, I dissent in part.

NUMBER 06-26

COURT OF APPEAL, THIRD CIRCUIT
STATE OF LOUISIANA

LOUISE BULLOCK

VERSUS

THE RAPIDES FOUNDATION D/B/A RAPIDES REGIONAL MEDICAL
CENTER

(consolidated with)

NUMBER 06-27

COURT OF APPEAL, THIRD CIRCUIT
STATE OF LOUISIANA

WALTER RANDALL

VERSUS

THE RAPIDES FOUNDATION D/B/A RAPIDES REGIONAL MEDICAL
CENTER

AMY, J., dissenting.

In my opinion, the trial court's imposition of liability on Rapides Regional was

error. Insofar as recovery was based on a theory of negligence, I find that the facts

and circumstances of this case do not reveal a duty to equip this physician's stool

with a locking mechanism or to warn that it was for physician's use. *See Posecai v.*

*Wal-Mart Stores, Inc.*, 99-1222 (La. 11/30/99), 752 So.2d 762 (wherein the supreme

court explained that the question of whether a duty exists is a question of law and the

determination as to whether a duty exists in a particular court requires the court to

make a policy decision in light of the unique facts and circumstances presented).

Photographs and testimony indicate that the five-wheeled stool was obviously

a rolling one. There is no indication that the stool was faulty or that it malfunctioned.

Furthermore, and relevant to the question of whether a warning label was required,

the plaintiff explained that she had previously used rolling stools and was aware that the stool was for physician use. Insofar as various other stools at the hospital had been labeled by staff members, testimony indicated that the labeling was done in order to reserve the stool for staff use rather than as an injury-prevention measure. With regard to the lack of a locking mechanism, the plaintiff did not establish that such a mechanism was available, desirable, or even possible for such a rolling stool.

Insofar as the parties' arguments reference strict liability recovery, I find that the plaintiff's evidence fails in this regard as well. Again, the plaintiff did not establish the existence of a vice or defect in the stool's operation. Notwithstanding this failure, the record further lacks indication of an unreasonable risk of harm. As noted in *Boyle v. Board of Supervisors, Louisiana State Univ.,* 96-1158 (La. 1/14/97), 685 So.2d 1080, consideration of whether an unreasonable risk of harm exists is guided by a risk-utility balancing test which weighs factors such as gravity and risk of harm with individual and societal rights and obligations, as well as the social utility involved.

As pointed out by the plaintiff, a number of incidents involving the stools had occurred at the hospital. According to Ms. Noel, the hospital's Vice-President of Resource, Risk and Quality Management, these incidents occurred approximately 1.25 times per year. However, this number must be considered in light of Ms. Noel's further testimony that approximately 120,000 patients and visitors enter the emergency department each year. Furthermore, Ms. Noel was aware of only one other stool-related incident that resulted in medical treatment during the six-year period. She explained that, to her knowledge, Ms. Bullock's injuries were the most serious of those associated with the stools. Ms. Noel reported that the stool incidents rank "very, very low" in the incidents generally arising at the hospital.

2

As for the stool's utility, the record contains the testimony of Dr. John Giroir, Jr., the emergency department's Medical Director. He explained that the stool is common medical equipment in many facilities. He did not recall cautionary labeling on stools in other facilities. When asked about the stool's purpose, he explained:

> Quite frequently, we do some type of - of procedures where it's easier to be performed if you are close up to whatever you're performing; suturing, minor procedures where you might be removing a foreign body or doing an incision drainage on an abscess. They're used when we do pelvic examinations. We use them when we examine an eye using an instrument called a slit lamp. I also use it quite frequently when I'm taking a history from a patient. I'll - I'll sit on the stool and have my chart and be questioning them and then writing on the chart as I'm taking their history.

In light of the relatively low risk associated with the stool's use and the unquestioned utility, any determination that the plaintiff established an unreasonable risk of harm is erroneous.

As I find that the plaintiff failed to establish the elements necessary for recovery under either a theory of negligence or a theory of strict liability, I conclude that the trial court's imposition of liability on Rapides Regional was in error. Accordingly, I respectfully dissent from the majority opinion.

3